```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
```

BRIAN MAXEY,                    )
                                )
             Plaintiff,         )
                                )
    v.                          )     No.  06 C 5153
                                )
THOMAS MONAHAN, et al.,         )
                                )
             Defendants.        )

## MEMORANDUM OPINION AND ORDER

Brian Maxey ("Maxey"), a civil detainee held at a state facility, originally brought this 42 U.S.C. §1983 ("Section 1983") action pro se, seeking relief against multiple defendants. Those defendants who are relevant to the current motion are Carol Vance, Jovita Anyanwu and Addus HealthCare, Inc. (for convenience collectively "Addus," treated as a singular noun). After this Court appointed Jason Burlingame ("Burlingame") to represent Maxey, Burlingame engaged in settlement negotiations with Addus' counsel Eydie Glassman ("Glassman").

Maxey now brings a motion to enforce a settlement agreement assertedly reached with Addus through their respective counsel, while Addus denies the existence of any such agreement. Both sides have agreed that the motion and any disputed facts may be decided by this Court on the briefs and supporting papers without the need for a jury or evidentiary hearing, so that this Court may make factual findings as well as reaching conclusions of

law.[1]  For the reasons set out in this memorandum opinion and
order, Maxey's motion is granted.

## Background

As to the underlying substance of this action, Maxey alleges
that Addus has violated his Fourteenth Amendment rights (more
specifically, the Eighth Amendment's guaranties incorporated via
the Fourteenth) by denying him access to an ear, nose and throat
specialist ("Specialist") and to related care with deliberate
indifference to a medical problem assertedly affecting Maxey's
ear, causing him long term pain and suffering.  Beginning in
January 2007[2] Burlingame and Glassman undertook potential
settlement discussions on behalf of their clients (B. Aff. ¶3),
and it is the ultimate result of those discussions that is now at
issue.

In general the discussions centered around Addus committing
to provide Maxey a consultation with an outside Specialist to
examine his ears and to determine whether there is indeed any
medical condition that requires treatment beyond what Addus had
already afforded him (see, e.g., M. Mem. Ex. 5).  That
arrangement and the consequences of the Specialist's examination

---

[1]For that purpose this opinion cites Maxey's Motion To
Enforce Settlement Agreement as "M. Mem.," Addus' Response as "A.
Mem." and Burlingame's and Glassman's respective affidavits as
"B. Aff. ¶--" and "G. Aff. ¶--."

[2]Because all relevant events occurred in 2007, all other
dates mentioned in this opinion will omit the year reference.

are spelled out in Burlingame's Affidavit attached as Exhibit A to Maxey's motion (B. Aff. ¶¶6-7), which this Court credits as an accurate version of Addus' February 5 settlement offer:

> 6. Ms. Glassman spoke with me by telephone on Monday, February 5, 2007. Ms. Glassman stated that she had spoken with her clients, who had agreed to allow Maxey to be treated by a Ear, Nose and Throat specialist of his choice in exchange for Maxey's agreement that he dismiss the lawsuit against Addus if the ENT specialist determined there was nothing wrong with his ears. Ms. Glassman further stated that in the event that the ENT specialist diagnosed a problem with Maxey's ear(s) and proposed an alternative treatment, Addus further agreed to follow the recommended course of treatment and the lawsuit would continue.
>
> 7. I specifically reiterated the point that Maxey would not be required to dismiss his lawsuit under the terms of the settlement if the ENT specialist diagnosed a problem with Maxey's ear(s). Ms. Glassman affirmed my understanding of the Addus settlement proposal, stating that Addus was confident that the ENT specialist would not find anything wrong with Maxey's ear(s) and, on the off chance that the ENT specialist diagnosed a problem with Maxey's ear(s), it would only take a simple motion for summary judgment to get Addus out of the case.

On February 12 Glassman responded to Burlingame's confirmation of Maxey's having accepted that offer with an e-mail notifying him that Addus was not prepared to settle and that the parties should instead move forward with discovery (M. Mem. Ex. 8). But Maxey contends that repudiation came too late because Burlingame had already accepted Addus' February 5 offer, creating an enforceable settlement agreement. Addus retorts by asserting

that there had never been a meeting of the minds between counsel as to all the material terms of the agreement and, more fundamentally, that the settlement conversations were merely preliminary discussions between counsel that Glassman had not yet presented to Addus for agreement.

Purported Settlement Agreement

It should be said at the outset that because the current motion is advanced in the context of a pending action (and is not a post-dismissal effort to enforce a settlement that had led to such dismissal), no <u>Kokkonen v. Guardian Life Insurance Co. of America</u>, 511 U.S. 375 (1994) problems are presented -- this Court unquestionably has jurisdiction to decide this matter (<u>Wilson v. Wilson</u>, 46 F.3d 660, 664 (7th Cir. 1995)). As for the applicable rules of decision, <u>Abbott Laboratories v. Alpha Therapeutic Corp.</u>, 164 F.3d 385, 387 (7th Cir. 1999) teaches:

> Local contract law governs the construction and enforcement of settlement agreements.[3]

In Illinois -- the source of "local contract law" here -- a settlement agreement may be created by a formal writing or the exchange of informal writings or through oral statements in or out of court (see, e.g., <u>id.</u> at 388-89 and <u>Wilson</u>, 46 F.3d at

---

[3][Footnote by this Court] Although the underlying claim in <u>Abbott</u> was asserted in a diversity action governed by state law, while the underlying claim here is federal in nature, the matter now at issue is a straight-out contract claim that would not appear to look to federal common law (if any there be).

-4-

666, both applying Illinois law; Pritchett v. Asbestos Claims Mgmt. Corp., 332 Ill.App.3d 890, 896, 773 N.E.2d 1277, 1282 (5th Dist. 2002)). In all events there must be an offer and acceptance that evidence a meeting of the minds reflecting an understanding "so definite with respect to its material terms that the promises and performances to be rendered by each party are reasonably certain" (Pritchett, 332 Ill.App.3d at 896, 773 N.E.2d at 1282; accord, Midland Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill.2d 306, 313-14, 515 N.E.2d 61, 65 (1987)). Importantly, the parties need not "share the same subjective understanding as to the terms of the contract" -- instead it suffices that their conduct and words objectively demonstrate their assent to those terms (Midland Hotel, id. at 313-14, 515 N.E.2d at 65).

Thus, in a return to Contracts 101 in first-year law school, this Court must initially identify the offer and the acceptance that make up the asserted settlement agreement.[4] For that

---

[4]Regrettably Addus' Response repeatedly casts a totally false light on an in-court statement by Maxey's appointed counsel Burlingame on February 15 as to when the parties' had settled the case (A. Mem. 1-2, 4, 5, 7), and that false attack is repeated at three places in the affidavit of Addus' lawyer Glassman, attached as Ex. B to that Response (Glassman Aff. ¶¶11, 12, 21). There is no warrant for such mischaracterizations or for Addus' pejorative charge that Burlingame had "attempted to artfully create a contract, where one didn't exist" (A. Mem. 7). What is at issue here is rather a good-faith dispute as to the legal effect of both sides' words and conduct, except as such mischaracterizations may cast a cloud on Addus' good faith.

purpose the starting point is of course the settlement offer proposed by Addus through Glassman in her February 5 telephone conversation with Burlingame, as spelled out in the earlier quotation of his Aff. ¶¶6-7.

Then after consulting with his client, Burlingame e-mailed Glassman on February 12 to accept Addus' offer on Maxey's behalf, again memorializing the parties' agreement (M. Mem. Ex. 4):

> My client will accept the terms of the settlement offer we discussed last week.
>
> My understanding of that offer is as follows: Addus (presumably with Monahan's consent) will agree to have Maxey seen by an Ear, Nose and Throat specialist of his choice, presumably in one of the following four cities: Decatur, Peoria, Springfield or Champaign. To the extent the specialist determines that there is nothing wrong with Maxey's ears, Maxey will voluntarily dismiss the suit against Monahan, Vance, Anyanwu and Addus HealthCare. To the extent the specialist finds something wrong with Maxey's ears, Addus will follow the specialist's recommended course of treatment and the lawsuit will continue. Treatment by the ENT specialist further moots the motion for injunctive relief that Maxey was prepared to file absent this agreement. It is my further recommendation that the date of the appointment with the ENT specialist not be disclosed to Maxey to eliminate any possible claims by Addus that Maxey intentionally irritated his ears immediately prior to the appointment.
>
> Please let me know if I have misstated any part of Addus' settlement proposal. Also, to the extent you have proposed settlement language memorializing the terms of this agreement, please provide me with a draft agreement for my review and comments.

If that were unquestionably the end of the story, there could be no debate that an enforceable settlement agreement had

been formed between the parties.  But Addus attempts to muddy the settlement waters by pointing to Glassman's responsive e-mail, arguing that there had been no meeting of the minds as to at least one material term of the agreement:  whether Maxey would still voluntarily dismiss the lawsuit if the Specialist found a medical problem with Maxey's ears that required treatment.  That e-mail took the confusing form of quoting Burlingame's prior e-mail and embedding Glassman's responsive comments in the text (M. Mem. Ex. 5, with Glassman's comments underlined for clarity):

> To the extent the specialist finds something wrong with Maxey's ears, Addus will follow the specialist's recommended course of treatment and the lawsuit will continue[.]  <u>Addus will agree to follow the treatment as prescribes [sic] so the law suit should not continue, if they agree by settlement to do so.  He can always bring a case later to enforce the settlement agreement right or would you still be seeking damages?  I think Addus is expecting that the lawsuit be dropped and they will agree to follow the prescribed treatment.</u>

As Addus would have it, that e-mail shows that Burlingame's expressed understanding of the offer was that if the Specialist found a problem with Maxey's ears, Addus would provide treatment and the lawsuit would continue -- presumably in an attempt to use that diagnosis as some proof of Addus' deliberate indifference to Maxey's condition, entitling him to damages.  In contrast, Glassman's response stated that if the Specialist diagnosed a problem, Addus would provide the necessary care, but Maxey would

still drop the lawsuit.[5] Thus Addus contends that Maxey's acceptance was ineffective because it was not on terms identical to those offered by Addus, so that no agreement had been reached before Glassman e-mailed Burlingame later that evening to state explicitly that Addus would not agree to settlement (M. Mem. Ex. 8).

That argument simply does not mesh with the credible evidence presented by Maxey. Immediately after receiving Glassman's just-quoted February 12 e-mail, Burlingame e-mailed back (M. Mem. Ex. 6):

> I can't agree in advance to dismiss the lawsuit if the specialist says there is, indeed, something wrong with Maxey's ears. However, as you and I discussed, if the specialist merely proposes a different treatment than those previously suggested by Addus, that would not necessarily constitute evidence of deliberate indifference and I have repeatedly counseled and will continue to counsel my client accordingly.
>
> My understanding was that the case goes away if the doctor finds nothing wrong, the case heats up if the doctor expresses shock at the untreated condition of my client's ears, and the case remains (but is presumably weakened and easily dismissible) if the doctor merely recommends an alternative course of treatment for a mild ear infection. Your client is adamant that it

---

[5] Even apart from the ensuing analysis in the text, Glassman's interpolation is puzzling. What is meant by "the lawsuit should not continue if they agree by settlement to do so"? Does that indicate that in the absence of such agreement the lawsuit would continue if the Specialist did identify an ear problem? If so, the settlement as set out by Burlingame would be further buttressed. But as the discussion in the text goes on to demonstrate, it is unnecessary to rely on a parsing of Glassman's inartful phrasing to sustain Maxey's position, which is demonstrably sound on its own.

> will be the first option and my client is adamant that it will be the second option. Hopefully for all of us, it will not be the third option.
>
> Thoughts?

In the offer-and-acceptance drill, that statement was precisely the same as the terms of Addus' February 5 offer, as quoted in the Background section of this opinion and as accepted in Burlingame's initial February 12 e-mail -- it properly challenged Glassman's effort in her February 12 response to change the terms of the already accepted offer. Indeed, Glassman's next response at 3:40 p.m. the same day (M. Mem. Ex. 6) did not dispute those earlier-agreed-on terms, but rather expressed her agreement with those terms:

> That's fine because if he did recommend a different course of treatment it [sic] (that didn't raise to the level of being unconstitutional) it would be a simple motion for summary judgment to end the case anyway. I'll get agreement from the client regarding this before our case management.[6]

And to drive the final nail in Addus' contractual coffin, in a phone call between Glassman and Burlingame the next day (February 13) Glassman reconfirmed that Addus had indeed made the February 5 offer as Burlingame had reported it (B. Aff. ¶15).

In sum, from the entire sequence of events this Court finds that Burlingame's affidavit is entirely credible: Addus made a

---

[6] [Footnote by this Court] More on the effect (or, more accurately, the lack of effect) of the last-quoted sentence later.

settlement offer to Maxey on February 5 on the terms described in B. Aff. ¶¶6-7, an offer that was reiterated and accepted in Burlingame's February 12 e-mails. Because Maxey accepted that offer at 3:10 p.m. February 12 (M. Mem. Ex. 4), the agreement was binding and enforceable at that time, so that Addus' attempted retraction at 7:43 p.m. that evening (M. Mem. Ex. 8) came too late. As the elemental contract law taught in 1 Williston on Contracts §5:8 (Richard Lord, ed., 4th ed. 2006) puts it, "[o]nce an offer has been duly accepted, it is fundamental that revocation of the offer is no longer possible" (see also Paramount Pictures Distrib. Corp. v. Gehring, 283 Ill.App. 581, 589 (1st Dist. 1936)).

Despite the confirmatory impact of those communications between Glassman and Burlingame, Addus still maintains that it never gave Glassman the authority to settle on those terms and therefore cannot be bound by them. In Illinois an attorney's authority to represent a client in litigation does not automatically equate to the attorney's authority to settle that lawsuit on behalf of the client (Brewer v. Nat'l R.R. Passenger Corp., 165 Ill.2d 100, 105, 649 N.E.2d 1331, 1333-34 (1995)). To settle a lawsuit the attorney must obtain express authority from the client to do so (id.). Brewer, id. at 105-06, 649 N.E.2d at 1334 (citations omitted) explained how that rule affects a litigant's burden in an effort to enforce a contested settlement

agreement as here:

> Where a settlement is made out of court and is not made a part of the judgment, the client will not be bound by the agreement without proof of express authority. This authority will not be presumed and the burden of proof rests on the party alleging authority to show that fact. Further, in such a case, opposing counsel is put on notice to ascertain the attorney's authority. If opposing counsel fails to make inquiry or to demand proof of the attorney's authority, opposing counsel deals with the attorney at his or her peril.

In that regard Addus seeks support in Glassman's Aff. ¶¶23 and 26, which claim that her negotiations with Burlingame were merely preliminary discussions between counsel to hammer out terms that she would bring to her client only later for agreement. And Addus seeks to buttress that position with the earlier-quoted sentence from Glassman's 3:40 p.m. February 12 e-mail to Burlingame:

> I'll get agreement from the client regarding this before our case management.

But once again Addus' story and Glassman's version of events do not ring true. As Burlingame related in his wholly credible affidavit, on February 5 Glassman had clearly stated her authority to settle on the then-stated terms (B. Aff. ¶¶6-7).[7] Moreover, even after the February 12 back-and-forth between counsel, Glassman again confirmed her authority to have settled

---

[7] In part that affidavit, in describing those terms, stated:
> Ms. Glassman stated that she had spoken with her clients, who had agreed . . . .

And later she continued by stating what "Addus further agreed to."

-11-

on the February 5 terms.  Here is Burlingame's statement of his February 13 conversation with Glassman (B. Aff. ¶15), which this Court credits:

> In a telephone conference on February 13, 2007, I expressed frustration with the fact that Addus was reneging on the agreement reached between counsel. Ms. Glassman stated that she had spoken with Addus, who had approved the February 5 settlement proposal. Ms. Glassman further stated that the partner on the file and the insurance company for Addus had since expressed concerns with the structure of the settlement, as accepted by Maxey.

It is of course black letter law that an agent's authority must come from the principal -- the agent's bootstrap statements alone won't cut it.  But in this instance this Court discredits Addus' (and Glassman's) after-the-fact attempted disclaimer of authority.  Instead it credits Glassman's original February 5 version (and her confirmatory February 13 version) as an accurate reflection of the authority that Addus had in fact conferred on her (see Hernandez v. New Rogers Pontiac, Inc., 332 Ill.App.3d 461, 466-68, 773 N.E.2d 77, 82-83 (1st Dist. 2002)).  It is of no moment that Addus' insurance provider and senior counsel sought to second-guess the deal after it was made.  Once client Addus had given authority to Glassman to make the February 5 offer (as it did) and Maxey had then accepted it, Addus was bound by the terms of the agreement it had made.

## Conclusion

As stated in this opinion, this Court finds that Addus in

-12-

fact authorized Glassman to offer the terms she presented to Burlingame in their February 5 phone call, as set forth in B. Aff. ¶¶6-7. Maxey accepted those terms via Burlingame's 3:10 p.m. February 12 e-mail, thus forming a binding agreement between Maxey and Addus. Maxey's motion is therefore granted, and this Court holds that Maxey and Addus are mutually bound by the terms of that agreement. This case is set for a status hearing at 9 a.m. March 28, 2007 to discuss the further course of proceedings.

_____
Milton I. Shadur
Senior United States District Judge

Date: March 20, 2007